UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LUDA BLAJEI,

              Plaintiff,                    Civil Action No. 11-cv-13269

      v.                           District Judge Arthur J. Tarnow
                                   Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [11, 12]**

      Plaintiff Luda Blajei brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act. Both parties filed summary judgment motions (Dkts. 11, 12), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 2).

**I. RECOMMENDATION**

      For the reasons set forth below, this Court finds that the Administrative Law Judge's decision is not supported by substantial evidence. Moreover, the Court finds that the ALJ did not comply with 20 C.F.R. § 404.1527 and § 404.1529(c)(3) regarding the treating source rule and credibility assessments. Accordingly, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED in part, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED for further analysis in conformity with 20 C.F.R. § 404.1527 and § 404.1529(c)(3).

## II. REPORT

### A. Procedural History

On October 19, 2005, Plaintiff filed an application for DIB asserting that she became unable to work on March 14, 2005. (Tr. 104-07.) The Commissioner initially denied Plaintiff's disability application on January 11, 2006. (Tr. 59-63.) Plaintiff then filed a request for a hearing, and on January 14, 2008, she appeared with counsel before Administrative Law Judge ("ALJ") Michael F. Wilenkin, who considered the case *de novo*. (Tr. 402-37.) In a February 7, 2008 decision, ALJ Wilenkin found that Plaintiff was not disabled. (Tr. 46-56.) On March 3, 2008, Plaintiff requested a review of this decision. (Tr. 65.) The Appeals Council granted review, and remanded the case to ALJ Wilenkin to "[o]btain additional evidence concerning the claimant's impairment" and "[g]ive further consideration to the claimant's maximum residual functional capacity." (Tr. 67-69.) In a subsequent May 7, 2009 decision, ALJ Wilenkin again found that Plaintiff was not disabled. (Tr. 9-22.) His decision became the final decision of the Commissioner on June 29, 2011, when the Appeals Council denied Plaintiff's second request for review. (Tr. 5.) Plaintiff filed this suit on July 27, 2011. (Dkt. 1.)

### B. Background

Plaintiff was 51 years old on the alleged disability onset date. (Tr. 405.) She has a Bachelors of Science degree in mechanical engineering, and worked for General Motors as a quality engineer until March 11, 2005. (Tr. 407.)

#### 1. Plaintiff's Testimony at the Hearing Before the ALJ

Plaintiff was in a car accident in 2004. (Tr. 407-08.) She did not have any immediate symptoms from the car accident, but approximately three to four months after the accident, she

began experiencing numbness in her arm and back. (Tr. 409.) She ultimately left her job on March 11, 2005 due to increasing numbness and pain. (Tr. 410.) She received a "lump sum" payment from her insurance company, and disability benefits from GM until March 20, 2006. (*Id.*); *see also Blajei v. Sedgwick Claims Management Svcs. et al.*, 721 F. Supp. 2d 584, 591 (E.D. Mich. 2010). Based on an Independent Medical Exam performed at the behest of GM's insurance provider in October of 2006, GM requested Plaintiff return to work. (Tr. 411.); *see also Blajei*, 721 F. Supp. at 592. On November 6, 2006, Plaintiff returned to work, but lasted only four hours due to her back pain. *Id.*

Plaintiff testified that her symptoms include pain and numbness in her "buttocks" and lower back. (Tr. 412.) The pain radiates down to her foot on the left side, and increases when sitting for a long period of time. (Tr. 412-13.) She testified that she can only sit for approximately thirty minutes at a time, and can only stand for about thirty minutes at a time. (Tr. 414.)

Plaintiff had radical diskectomy surgery on July 10, 2005. (Tr. 414.) The surgery was not a success and did not resolve her pain. (*Id.*; Tr. 427.) Plaintiff testified that she will not try TNS or transcutaneious stimulation for her back because, after the failure of her first surgery, she is afraid to do anything. (Tr. 415-16.) She also testified that she tried physical therapy, but did not improve. (Tr. 416.)

Plaintiff also has pain and stiffness in her neck. (Tr. 418.) The pain goes from her neck into her shoulder all the way to her hand. (Tr. 418-19.) She has tried wearing a collar, physical therapy, message, acupressure and heat therapy, but none of these treatments consistently relieve her pain. (Tr. 419-20.) Plaintiff also has trouble sleeping. (Tr. 421.)

Plaintiff testified that she is able to take care of her personal needs, but is slow. (Tr. 422.) She also testified that she usually tries to walk for twenty or twenty-five minutes each day, but has

3

to lie down several times during a day.  (Tr. 423, 424-25.)  Plaintiff has tried several medications

to resolve her pain.  (Tr. 425-26.) Plaintiff stopped taking some of the stronger medications –

Oxycontin and Duragesic patches – because they caused her to vomit. (Tr. 425-26.)  She currently

takes Hydorcodone or Vicodin four or five times a day for pain.  (Tr. 428.)  She experiences

dizziness and nausea from these medications.  (*Id.*)

### 2. *Vocational Expert Testimony*

Vocational Expert ("VE") Elaine Trippy testified at the hearing.  (Tr. 430-37.)  The ALJ first

asked the VE to consider the Plaintiff as she presented at the hearing, assuming "that her description

of limitations is an accurate reflection of her ability to function on [a] sustained basis during the

course of a typical workday."  (Tr. 431.)  The VE testified that Plaintiff would not be able to perform

her past relevant work assuming her testimony was accurate.  (*Id.*)  The ALJ then asked the VE to

assume the following:

> [T]hat there is no medically discernable need to lie down during the
> course of a typical workday, then notwithstanding the use of pain
> medications, she's nevertheless able to perform all of the usual
> customary, cognitive aspects of vocational activities.

(Tr. 431.)

The VE testified Plaintiff would then be able to return to her prior work.  (Tr. 431.)  The ALJ

then asked the VE whether Plaintiff's prior work was "amendable to changing position[s] between

sitting and standing every thirty minutes."  (Tr. 431.)  The VE testified:

> [T]he majority of her work would need to be performed seated
> because she's operating a computer.  Certainly, she could stand up
> and do some work, but if she had [to] stand up for half of the time
> and sit for half of the time, [then] she would have difficulty to [sic]
> performing it.  She could stand up for a few minutes and move
> around, and come back and sit down again. . . .

(Tr. 432 (emphasis added).)

The VE further testified that the job is not susceptible to "being performed on a sustained basis while standing." (Tr. 432.) Upon questioning by Plaintiff's counsel, the VE's acknowledged that if Plaintiff's job required checking approximately 800 computer records a day for safety issues, as Plaintiff testified, it would not be amenable to long periods of standing. (Tr. 407, 435-36.)

### 3.  Medical Evidence

Plaintiff suffers from cervical radiculopathy, cervical spondylosis and degenerative disc disease. (Tr. 97, 99, 140.) She has had several MRIs, EMGs, and countless other tests, which all confirm this diagnosis. (Tr. 97-400.) She had a radical diskectomy on July 10, 2005, which was unsuccessful, and did not relieve any of her pain. (Tr. 156-57; 166-67;361, 362, 375.) Since the objective medical evidence is undisputed, the Court will summarize the contradictory opinion evidence.

### a.  Treating Physician Evidence

Dr. Fernando G. Diaz performed a "radical anterior diskectomy and artificial disk replacement at L5-S1" on Plaintiff on August 10, 2005. (Tr. 156-57; 166-67.) In her initial follow-up appointments with Dr. Diaz, it appears that Plaintiff continued to experience pain. (Tr. 205-12.) On September 13, 2005, Dr. Diaz recommended that Plaintiff see Dr. Sophia Grias of Spinal & Orthopedic Rehabilitation ("SOR") "to get her started on a return to work program and back reconditioning." (Tr. 203.) On October 25, 2005, Dr. Diaz noted that Plaintiff's initial "pain in the left lower extremity" had improved, and was "nearly completely resolved." (Tr. 194.) He also noted that her back pain was better and that Plaintiff believed that physical therapy was helping. (*Id.*) Lastly, he told Plaintiff to continue under the care of Dr. Grias, and that "Dr. Grias will release

5

her back to work."  (Tr.194.)

Dr. Sophia Grias and Therapist Thomas Sheppard from SOR treated Plaintiff post-surgery. (Tr. 178-83.)  On October 25, 2005, Sheppard indicated that one of Plaintiff's long term goals was to "be able to perform all [Activities of Daily Living] without difficulty."  (Tr. 183.)  On November 15, 2005, either Dr. Grias or Therapist Sheppard noted that Plaintiff had just returned from a ten day vacation to Costa Rica.  (Tr. 178-83.)  On November 21, 2005, Dr. Grias noted that Plaintiff "can sit about 20 minutes and she has to get up.  She does feel[] stronger from doing therapy and the therapy is helping her pain level."  (Tr. 191.)  Dr. Grias noted that Plaintiff was "independent in basic ADLs," but had "difficulty with advanced ADLs."  (Tr. 191.)

Dr. Laina Feinstein of Franklin Medical Consultants was Plaintiff's primary care physician from 1997 through 2006.  (Tr. 228-326.)  On August 16, 2006, Dr. Feinstein signed a "Physician's Statement of Disability" for Plaintiff's Sickness and Accident ("S & A") benefits claim that stated:

> Luda Blajei's overall prognosis is poor and it is my medical opinion that she is – and will continue to be – totally and permanently disabled from any and all employment at this time.  It is also my medical opinion that her complete disability existed on March 11, 2005.

(Tr. 98.)

On September 12, 2006, Dr. Feinstein completed a Work-Related Activities form for Plaintiff that indicated that Plaintiff could sit, stand and walk for only a half hour at one time respectively.  (Tr. 228.)  She further indicated that Plaintiff could only sit, stand and walk for three hours during an entire eight-hour work day respectively.  (*Id*.)  Lastly, she indicated that  Plaintiff could lift and carry up to five pounds.  (*Id*.)  She did not restrict Plaintiff from driving.  (*Id*.)

From the records, it appears that Dr. Lawrence T. Kurz treated Plaintiff's back pain from

6

November of 2005 through March of 2007.  (Tr. 346-57.)  On November 11, 2005, Dr. Kurz told

Plaintiff that she did not need further surgical treatment.  (Tr. 357.)  Indeed, he questioned the

wisdom of having the initial surgery.  (*Id*.)  On December 22, 2005, Dr. Kurz indicated that Plaintiff

would be "on an 'Off Work' status for a couple of months."  (Tr. 354.) On February 21, 2006,

Plaintiff returned to Dr. Kurz's office and saw Dr. Ronald S. Taylor.  (Tr. 351.)  Dr. Taylor noted

the following: "We tell her that she simply should go back to the doctor who did her artificial disc

and see what he thinks, but she indicates he says he cannot do anything for her, and frankly neither

can [we]."  (Tr. 351.)

On March 1, 2006, Dr. Kurz completed a Work-Related Activities form for Plaintiff.  (Tr.

348.)  In this form, Dr. Kurz indicated that Plaintiff could sit, stand and walk for only a half hour

at one time respectively.  (*Id*.)  He further indicated that Plaintiff could only sit, stand and walk for

three hours during an entire eight-hour work day respectively.  (*Id*.).  Lastly he indicated that

Plaintiff could lift and carry up to twenty pounds occasionally.  (*Id*.)

Plaintiff treated with Dr. Alexander Vertkin from August 8, 2006 through December 12,

2007.  (Tr. 388-400.)  On May 20, 2007, Dr. Alexander Vertkin signed a "Physician's Statement of

Disability," again for Plaintiff's S & A benefits claim, that stated:

> On August 29, 2006, December 4, 2006 and March 21, 2007, I
> completed Attending Physician Statements which consistently state
> that Mrs. Blajei is "Totally Disabled" from any and all employment
> due to the above-described disabling medical condition.

(Tr. 101.)

In addition, like Feinstein's statement, Dr. Vertkin stated:

> Luda Blajei's overall prognosis is poor and it is my medical opinion
> that she is – and will continue to be – totally and permanently
> disabled from any and all employment at this time.  It is also my
> medical opinion that her complete disability existed on March 11,

2005.
(Tr. 101.)

Dr. Vertkin referred Plaintiff to three different doctors for consultation in 2006:  Dr. Kiroac of Michigan Pain Management Consultants, Dr. Lawrence Eilender of Neurological Consultation, and Dr. Bruce H. Kole of Southfield Neurological Associates.  (Tr. 360, 365, 375.)

Plaintiff saw Dr. Jeffrey Kirouac on May 16, 2006.  (Tr. 360.) He suggested that Plaintiff return to Dr. Diaz to see if she was a candidate for epidural injections.  (Tr. 361.)

Plaintiff saw Dr. Lawrence M. Eilender for a neurological consultation on two occasions in 2006.  On May 15, 2006, Dr. Eilender indicated that, "[t]he patient basically has a chronic pain syndrome, which really does not fit into any specific neurologic dermatomes or distribution."  (Tr. 365.)  He indicated that he had no specific plan for her.  (*Id*.)  Plaintiff saw Dr. Eilender again on July 19, 2006.  (Tr. 362-63.)  He again indicated that "[t]his patient basically has a chronic pain syndrome and probably has fibromyalgia."  (Tr. 363.)  In his letter to Dr. Vertkin, he also stated: "As you know, Dr. Diaz operated on her before.  Of course, the patient did not get better after the procedure."  (Tr. 362.)

Plaintiff saw Dr. Kole on December 5, 2006.  (Tr. 377-78.)  In a letter to Dr. Vertkin, Dr. Kole stated, "I really don't see a neurological abnormality."  (Tr. 378.)  Plaintiff saw Dr. Kole again on January 25, 2007.  (Tr. 375.)  Dr. Kole again indicated that Plaintiff had "a perfectly normal neuro exam with normal motor bulk, tone, strength and coordination, normal reflexes, but she has many complaints."  (*Id*.)  Dr. Kole told Dr. Vertkin: "I have asked that she see Dr. Diaz again regarding her low back since she did have an artificial disc placed by him in the lumbosacral level." (*Id*.)

Dr. Vertkin sent Plaintiff to physical therapy.  (Tr. 380-84.)  It appears from the records that

8

Therapist Bob Shoemaker treated Plaintiff from July 22, 2006 through January 30, 2007. (Tr. 380-84.)

On December 12, 2007, Dr. Vertkin completed a Work-Related Activities form. (Tr. 387.) In this form, Dr. Vertkin, like Drs. Feinstein and Kurz, indicated that Plaintiff could sit, stand and walk for only a half hour at one time respectively. (*Id*.) Also like Drs. Feinstein and Kurz, he further indicated that Plaintiff could only sit, stand and walk for three hours during an entire eight-hour work day respectively. (*Id*.) Lastly he indicated that Plaintiff could lift and carry up to twenty pounds occasionally, but restricted her from driving. (*Id*.)

### b. Independent Medical Examinations

Dr. Phillip Friedman performed an independent medical examination of Plaintiff on or about July 29, 2005. (Tr. 150-55.) He did not express an opinion about Plaintiff's ability to work. It appears that his examination was for the purposes of litigation over the 2004 car accident because he concluded that: "The findings of the lumbar spine are primarily of a degenerative nature and the symptoms do not appear to have been precipitated by the motor vehicle accident." (Tr. 154.)

Plaintiff saw Dr. William Higginbothan at the request of one of Plaintiff's attorneys on September 25, 2006. (Tr. 366-69.) He diagnosed Plaintiff with "symptoms of cervical radiculopathy" and "lumbar radiculopathy." (Tr. 369.) He suggested pain management and modified activities. (*Id*.)

Plaintiff saw Dr. Emmanuel N. Obianwu for an evaluation at the behest of GM's insurance provider on October 26, 2006. (Tr. 370-74.) Dr. Obianwu stated that Plaintiff could return to work. (*Id*.)

### c. State Disability Determination Service Evidence

9

Nancy Sarti completed a Physical Residual Functional Capacity Assessment on behalf of the state disability determination service on December 22, 2005. (Tr. 140-147.) She determined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about six hours in an eight-hour work day, and sit about six hours in an eight-hour workday. (Tr. 141.)

On January 16, 2009, Dr. William Newman provided a statement for the SSA as well. (Tr. 103.) It is unclear whether Dr. Newman examined Plaintiff or simply reviewed her records. (*Id*.) Dr. Newman indicated that:

> In my opinion, she was disabled under the equivalent of 104A for a closed period from the time of onset of symptoms after the accident March 11, 2005 [sic] until recovery from her surgery, which would be around December 2005. Psychological factors may extend this period to 12 months.

(*Id*.)

### C. Framework for Disability Determinations

Under the Social Security Act (the "Act"), Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

10

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 14, 2005.  (Tr. 14.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "degenerative disc disease of L5-S1 status post disc replacement, cervical degenerative disc disease with bulging, mild thoracic degenerative disc disease, and complaints of bilateral upper and lower extremity radiculopathy."  (Tr. 14-15.)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (Tr. 17.)  Between steps three and four, the ALJ determined that Plaintiff had "the residual functional capacity to perform a limited range of sedentary work" as follows:

11

> Specifically, the claimant can lift 10 pounds occasionally, lift up to 10 pounds frequently; sit, stand or walk for eight hours in a work day with a sit/stand option where she sits two-thirds of an hour and stand[s] one-third of an hour; push or pull without limitation; perform postural activities occasionally; perform manipulative functions; see, hear and speak without limitation; and perform work in any environment. Mentally, the claimant can understand, remember and carry out complex instructions; make judgments on complex work-related decisions; interact appropriately with the public, supervisors and co-workers; respond appropriately to work pressures in a usual work setting; and respond appropriately to changes in a routine work setting.

(Tr. 15.) At step four, the ALJ found that Plaintiff could perform her past relevant work as a quality control engineer.  (Tr. 21.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations

omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F. Analysis

At the outset, the Court notes Plaintiff's argument that the ALJ's decision did not comport with the instructions given on remand by the Appeals Council. However, this Court can only review "the final decision of the Commissioner, and not intermediate administrative processes." *Peterson*

*v. Comm'r Soc. Sec.*, No. 09-11222, 2010 WL 420000, at *7 (E.D. Mich. Jan. 29, 2010) (Rosen, C.J.); *Betson v. Comm'r Soc. Sec*., No. 08-14943-BC, 2010 WL 1064434, at *4 (E.D. Mich. March 22, 2010) (Ludington, J.).  Therefore, this Court will address Plaintiff's remaining two claims of error:  that the ALJ did not comply with the treating source rule, and  that the ALJ improperly discredited the Plaintiff's testimony.  (Dkt. 11, Pl.'s Mot. Summ. J. at 13-17.)  The Court considers these claims of error in turn.

### 1. The ALJ Violated the Treating Source Rule

Plaintiff argues that the ALJ failed to give Plaintiff's treating physicians – Drs. Feinstein, Kurz, and Vertkin – controlling weight. (Dkt. 11, Pl.'s Mot. Summ. J. at 14.)  The Commissioner counters that "the ALJ provided good reasons for discounting the opinions . . . and reasonably rejected Plaintiff's testimony that she had extreme limitations."  (Dkt. 12, Def.'s Mot. Summ. J. at 14.)

The treating source rule generally requires an ALJ to give deference to the opinion of a claimant's treating source.  In particular, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'"  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); S.S.R. 96-2p, 1996 WL 374188 (1996).  And where an ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must then consider the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4)

"consistency of the opinion with the record as a whole," and (5) "the specialization of the treating

source." *Id.*; 20 C.F.R. § 404.1527.

In addition, the treating-source rule contains a procedural, explanatory requirement that an

ALJ give "good reasons" for the weight given a treating-source opinion. *See e.g.*, *Wilson*, 378 F.3d

at 544; *see also* S.S.R. 96-2p, 1996 WL 374188, at *5 (providing that a decision denying benefits

"must contain specific reasons for the weight given to the treating source's medical opinion,

supported by the evidence in the case record"). The purpose of this procedural requirement is two-

fold:

> The requirement of reason-giving exists, in part, to let claimants
> understand the disposition of their cases, particularly in situations
> where a claimant knows that his physician has deemed him disabled
> and therefore might be especially bewildered when told by an
> administrative bureaucracy that she is not, unless some reason for the
> agency's decision is supplied. The requirement also ensures that the
> ALJ applies the treating physician rule and permits meaningful
> review of the ALJ's application of the rule.

*Wilson*, 378 F.3d at 544 (internal quotation marks omitted); *see also* S.S.R. 96-2p, 1996 WL 374188,

at *5.

The ALJ assigned Dr. Feinstein's opinion "great weight." (Tr. 19.) In doing so, the ALJ

reasoned as follows:

> [T]he opinion is accorded great weight in that, to paraphrase, it
> generally allows for sedentary work with a sit/stand option. The
> environmental limitations are without evidentiary or medical support
> and are disregarded. The need for a limitation of five pounds is not
> consistent with the benign upper extremity clinical and objective
> findings of the record as described above.

(Tr. 19.)

While this explanation arguably addresses the relevant evidence and its lack of support for

the portion of Dr. Feinstein's opinion regarding Plaintiff's upper extremities and environmental

15

limitations, it does not address the other factors of 20 C.F.R. § 404.1527 or Dr. Feinstein's specific restrictions.   Moreover, while it plainly gives a reason for assigning Dr. Feinstein less than controlling weight, the reason does not meet the requirement of S.S.R. 96-2p and *Wilson*.   Indeed, the ALJ essentially gives "great weight" to Dr. Feinstein's opinion to the extent it is consistent  with his finding that Plaintiff has a sedentary residual functional capacity with a sit/stand option, but discredits the opinion to the extent it is inconsistent with that RFC.  This type of "cherry picking" is not allowed under the substantial evidence standard. *Laskowski v. Apfel*, 100 F. Supp. 2d 474, 482 (E.D. Mich. 2000.)  Indeed, the ALJ finds that the claimant can sit, stand or walk for eight hours in a work day with a sit/stand option where she sits two-thirds of an hour and stand[s] one-third of an hour.  (Tr. 15.)  He supports his variance from the recommendation of Dr. Feinstein by stating: "Nothing in this record indicates why the claimant could not sit for 40 minutes and then stand or walk for 20 minutes as opposed to the 30 minutes ascribed by the doctor."  (Tr. 19.)  Notably, the VE testified that Plaintiff would have to sit for a "majority of her work."  (Tr.432.) Therefore, the ALJ seems to be purposely circumventing this testimony with his variance from Dr. Feinstein's opinion.  This does not comply with the substantial evidence standard or the treating source rule. *Laskowski*, 100 F. Supp. 2d at 482; *Wilson*, 378 F.3d at 544.

Further, the ALJ completely disregards  Dr. Feinstein's finding that Plaintiff can sit only three hours in an eight hour day.  (Tr. 20.)  Given that Dr. Feinstein's opinion is supported by objective medical evidence (indeed, the ALJ gave it "great weight"), this violates the treating source rule.  An "ALJ may not substitute his own medical judgement for that of the treating physician where the opinion of the treating physician is supported by the medical evidence."  *Meece v. Barnhart*, 192 Fed. App'x 456, 465 (6th Cir. 2006).

16

Although not specifically raised by the Commissioner, the Court considers the harmless-error exception to the treating-physician rule. *See Wilson*, 378 F.3d at 547. This exception provides that a violation of the procedural requirement might be harmless error if (1) the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or (3) "the Commissioner has met the goal of § 1527(d)(2) . . . even though [he] has not complied with the terms of the regulation." *Id.* Nothing suggests that the opinion of Dr. Feinstein – restricting Plaintiff to thirty minutes of sitting at one time, and three hours of sitting during the entire eight-hour work day – was so extreme or unsupported as to be patently deficient. And, the ALJ did not adopt these functional limitations. (Tr. 15, 19.) Therefore, the Court must consider whether the ALJ met the goal of the treating source rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010).

The Commissioner focuses on Dr. Feinstein's opinion with regard to Plaintiff's use of her arms. (Dkt. 12, Def.'s Mot. Summ. J. at 15-16.) The Commissioner does not specifically address Dr. Feinstein's restriction of sitting only three hours in an eight hour day. (Tr. 16-17.) Moreover, the ALJ only addressed this restriction parenthetically – noting its similarity to the other treating physicians' opinions. (Tr. 20.) This does not meet the goal of the treating physician rule. (Tr. 432.) As such, the ALJ's violation of the treating source rule was not harmless with respect to Dr. Feinstein.

As with Dr. Feinstein, the ALJ assigned Dr. Kurz's opinion "moderate weight only to the extent that it is consistent with the above assessed residual functional capacity." (Tr. 20.) In doing so, the ALJ reasoned as follows:

17

> [T]he opinion was based upon a few, infrequent treatment visits during which the most remarkable thing was the persistence of the claimant's complaints. Dr. Kurz's opinion is quite inconsistent with those treatment notes and, in that respect is entitled to little weight. Indeed, it indicates that the claimant cannot squat, crawl, climb or reach at all, and has total restriction to unprotected heights, being around machinery and driving with moderate restriction in exposure to changes in temperature, humidity, dust, fumes and gases. The latter are utterly without support.

(Tr. 20.)

This explanation addresses the frequency of examination, the relevant evidence and its lack of support for a portion of Dr. Kurz's opinion, but it does not address the other factors of 20 C.F.R. § 404.1527. Moreover, the explanation suffers from the same faulty reasoning noted above with regard to Dr. Feinstein's opinion. As such, like with Dr. Feinstein, the ALJ violated the treating source rule, and the violation is not harmless.

Likewise, the ALJ assigned Dr. Vertkin's opinion "moderate weight only to the extent that it is consistent with the above assessed residual functional capacity." (Tr. 20.) In doing so, the ALJ reasoned as follows:

> This opinion, too, was based upon infrequent treatment and supported by fairly benign clinical and objective findings. The fact that the three opinions of Drs. Feinstein, Kurz and Vertkin were nearly identical and all made restrictions that are somewhat out of the norm (i.e., three hours of sitting, standing and walking) leads one to be cautious of the weight to be accorded them.

(Tr. 20.)

This explanation fails based on the same reasoning this Court outlined above with regard to Drs. Feinstein and Kurz.

The Court questions the ALJ's reluctance to give the treating physicians' opinions weight due to the fact that the opinions were nearly identical. (Dkt. 12, Def.'s Mot. Summ. J. at 18.) The Commissioner argues: "It could be argued that they were similar because Plaintiff's doctors

18

independently recognized her limitations.  However, the degree of similarity is striking, calling into question whether the opinions reflected each doctor's own evaluation of Plaintiff."  (*Id.*)

Notably, Dr. Feinstein imposed these limitations on September 12, 2006. (Tr. 228.) At that time, Dr. Feinstein had an almost ten year treating relationship with Plaintiff.  (Tr. 228-326.) Moreover, Dr. Feinstein's opinion as to Plaintiff's sit/stand limitations was supported by relevant objective evidence. (Tr. 228-236; 19.)  Finally, Dr. Feinstein did not have the benefit of the opinions of Drs. Kurz or Vertkin at that time.  (Tr. 228, 348, 387.)  As such, the similarity of her opinion to those of Drs. Kurz and Vertkin is not a "good reason" to give her less than "controlling weight." And if Drs. Kurz and Vertkin concurred with her opinion, one would expect to find similar restrictions. Therefore, this Court recommends remand for the ALJ to reevaluate the treating physician evidence, specifically the opinion of Dr. Feinstein and her restriction on Plaintiff's ability to sit to thirty minutes at one time and three hours in an eight-hour day.

### 2. The ALJ Did Not Give Good Reasons for His Credibility Assessment

Next, Plaintiff claims that the ALJ erred in discounting her testimony regarding her ability to sit for only a half hour at a time. (Dkt. 11, Pl.'s Mot. Summ. J. at 14.) The Commissioner argues that "[t]he ALJ noted that Plaintiff's credibility was diminished by the inconsistencies found throughout the record and provided many reasons for his finding." (Dkt. 12, Pl's Mot. Summ. J. at 18.)

A court is to accord an "ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). However, an ALJ must not reject a claimant's "statements about the intensity and persistence of

19

[her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [the claimant's] statements." 20 C.F.R. § 404.1529(c)(2); *see also* S.S.R. 96-7p, 1996 WL 374186. In fact, the regulations provide a non-exhaustive list of other considerations that should inform an ALJ's credibility assessment: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received for relief of pain or other symptoms; (6) any measures the claimant used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). Although an ALJ need not explicitly discuss every factor, *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005), an ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." S.S.R. 96-7p, 1996 WL 374186 at *2.

In this case, the ALJ gave very specific reasons for discounting Plaintiff's testimony. (Tr. 17-18.) However, most of the reasons are not supported by the record evidence. For example, the ALJ states: "The claimant also testified that the surgery did not reduce her back pain at all. However, as documented by treatment records, after the surgery she reported significant improvement in back pain, as well as in the lower extremity systems." (Tr. 17.) Indeed, in reality, Plaintiff reported that her initial "pain in the left lower extremity" had improved, and that her back

pain was "better." (Tr. 194.) Notably, however, she never stated that she had a "significant improvement in back pain." (*Id*.) Moreover, Plaintiff's condition subsequently deteriorated . (Tr. 228-400.) As another example, the ALJ noted that the "claimant testified that additional surgery has been recommended, but several doctors have indicated that surgery is not recommended and there is little they can do for her." (Tr. 17.) In reality, Plaintiff testified as follows:

> Q. Has further surgery been suggested for you?
>
> A. One doctor told [sic] that maybe neck surgery, but another –
>
> Q. I'm talking about your lower back.
>
> A. No.

(Tr. 415.)

There are several examples like this, where the ALJ's findings are directly contradicted by the records or hearing transcript. (*Compare* Tr. 17-18 *with* 228-437.) Indeed, the ALJ seems to rely on Plaintiff's varying descriptions of pain between 2004 and 2008 to discredit Plaintiff's hearing testimony. (Tr. 17-18.) However, an analysis of the record reveals that this reliance is not justified. The evidence reveals that Plaintiff had back surgery, which provided some relief of leg pain, but very little relief of back pain. (Tr. 228-400.) Moreover, the record evidence reveals that Plaintiff's back pain has continued at various levels since 2004 depending on medication, treatment and physical therapy. (Tr. 228-400.) This evidence is consistent with Plaintiff's testimony. (*Id*.; Tr. 402-37.)

Indeed, only one reason out of the approximately eleven reasons cited by the ALJ is supported by the record evidence. (Tr. 17, 228-400). The ALJ noted that Plaintiff took a ten day vacation to Costa Rica after her surgery, but then approximately a month later complained that she

could only sit for "about 20 minutes" due to pain. (Tr. 178-83, 191.) The Court does not believe that this one ten-day period of time within a five-year span of time constitutes substantial evidence to undermine Plaintiff's credibility. (*Compare* 178-83, 191 and 228-400.) Moreover, the ALJ did not ask her about this trip, and whether she continued to suffer pain and functional restrictions while traveling. (Tr. 400-37.) In short, the ALJ did not give good reasons for discrediting Plaintiff's testimony, and this Court recommends remand for the Commission to compare the record evidence and Plaintiff's testimony and either provide good reasons for discrediting Plaintiff as mandated by 20 C.F.R. § 404.1529(c)(3), or credit her testimony, and continue with the administrative process.

### G.  Conclusion

For the reasons set forth above, this Court finds that the Administrative Law Judge's decision is not supported by substantial evidence. Moreover, this Court finds that the ALJ did not comply with 20 C.F.R. § 404.1527 and§ 404.1529(c)(3) regarding the treating source rule and credibility assessments. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED in part, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED for further analysis in conformity with 20 C.F.R. § 404.1527 and§ 404.1529(c)(3).

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections,

but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).


                                        s/Laurie J. Michelson
                                        LAURIE J. MICHELSON
                                        UNITED STATES MAGISTRATE JUDGE

Dated:  June 18, 2012


                        CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 18, 2012.


                                        s/Jane Johnson
                                        Deputy Clerk